DAVID M. AND JUDITH A. POZAR, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Pozar v. Commissioner
Docket No. 3856-79.
United States Tax Court
T.C. Memo 1980-559; 1980 Tax Ct. Memo LEXIS 30; 41 T.C.M. (CCH) 571; T.C.M. (RIA) 80559; December 16, 1980
Harold L. Lawson, for the petitioners. Nancy B. Herbert and Vernon J. Owens, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: Respondent determined a deficiency of $ 254.86 in petitioners' 1976 income tax. The sole issue to be decided is whether payments made by Ohio State University constitute a scholarship or a fellowship within the meaning of section 117. [1]
FINDINGS OF FACT Some of the facts have been stipulated by the parties and are found accordingly. Petitioners were married and resided in Columbus, Ohio, when they *31 filed their petition in this case. They filed a joint Federal income tax return for 1976 with the Cincinnati Service Center, Covington, Kentucky. Judith Pozar is a party to this proceeding only because she filed a joint return with her husband, and he hereinafter will be referred to as petitioner. Petitioner graduated from the University of Akron in 1975 with a Bachelor of Science degree in Electrical Engineering. One year later, he received a Master of Science degree in Electrical Engineering from the same institution. He then continued his education by enrolling in the Ph.D. program in electrical engineering at Ohio State University (hereinafter Ohio State) and began his studies there in September of 1976. On or about March 19, 1976, petitioner was appointed as a graduate research associate in Ohio State's Department of Electrical Engineering's ElectroScience Laboratory. His appointment was temporary and ran from September 15, 1976, through June 30, 1977. The appointment was designed to give petitioner "an excellent opportunity to pursue graduate work with financial assistance and research experience." The appointment letter recognized that petitioner's research work would *32 be performed in connection with projects undertaken by the ElectroScience Laboratory but stated that "within the constraints of project support, the research performed in the ElectroScience Laboratory is matched to your thesis interests and usually leads to the satisfaction of the thesis requirement." The letter also went on to state that petitioner "must remain in good standing with the Graduate School." Ohio State provided fellowships as well as graduate research associate appointments, but petitioner sought an appointment in the latter category because there was greater assurance of continuity of status throughout the term of the Ph.D. program to degree candidates in research associate status. An integral part of Ohio State's electrical engineering doctoral program is extensive laboratory research. All doctoral candidates must engage in research, and it is expected that a candidate's laboratory work will form the basis of his doctoral dissertion. Ohio State requires each Ph.D. candidate to write a dissertation which significantly contributes to the literature of the student's chosen field, with the result that it is essential that Ohio State provide an environment in which *33 its doctoral students are exposed do challenging problems of current interest to scholars and professionals.Petitioner was able to identify his field of concentration at the time of his entrance into the Ohio State program as "Electromagnetic Theory and Antenna Studies," and his dissertation explored one aspect of that field. [2] There was a confluence between the research petitioner did as a graduate research associate and the research incorporated into his dissertation. Throughout his Ohio State career, petitioner performed his research as a graduate research associate at the University's ElectroScience Laboratory. He received general guidance, as contrasted with direct supervision, from both Professor C. H. Walter, an Ohio State faculty member and petitioner's thesis adviser, and Dr. Edward Newman, a non-faculty member of the ElectroScience Laboratory who directed, and engaged in, research in antenna theory. In exchange *34 for his laboratory work, petitioner received an exemption from Ohio State tuition and fees and received $ 425 per month, from which income tax was withheld. Petitioner worked with Dr. Newman because petitioner's area of interest coincided with Dr. Newman's area of research. The United States Army Research Office afforded Dr. Newman's research group financial assistance in connection with ElectroScience Laboratory projects and knew that some of the funds paid to Dr. Newman would be given in the form of research associateships to talented graduate students. Dr. Newman selected petitioner, after his appointment as a graduate research associate, to be a member of his staff based upon petitioner's expressed interest in antenna studies and his superior academic record. Petitioner's research environment was unstructured and informal. Although petitioner's appointment as a graduate research associate specified 20 hours of work per week, he was not required to work any particular hours and he was permitted to vary his hours of research above and below this level. In actuality, petitioner did far more hours of research than was specified, as was the case with all participants in the *35 Ph.D. program in the Ohio State engineering department. Petitioner received no additional payments for his extra work. Petitioner had no direct obligation, written or otherwise, to the Army Research Office. Moreover, petitioner had no obligation to anyone to produce written results beyond his dissertation, although, as he completed one or another pocket of research, he would summarize his conclusions for Dr. Newman. Some of the information which petitioner reported to Dr. Newman found its way into progress reports submitted by Ohio State with respect to the Army Research projects. Petitioner did not participate in a health, group life insurance, or retirement program under the terms of his research appointment. Throughout his stay at Ohio State, petitioner's scholastic performance was exemplary. OPINION There are two prongs to the issue before us: (1) Did the payments of $ 425 per month received by petitioner constitute a "scholarship" or "fellowship" within the meaning of section 117(a)(1) [3] (see Zolnay v. Commissioner, 49 T.C. 389, 396 (1968)); (2) if the previous question is answered in the affirmative, were the payments nevertheless compensation for *36 services in the nature of part-time employment within the meaning of the exception contained in section 117(b)(1) [4] (see Steiman v. Commissioner, 56 T.C. 1350, 1354 (1971)). Both prongs involve questions of fact and depend upon the particular circumstances of each case, and the burden of proof is on the petitioners. Olick v. Commissioner, 73 T.C. 479, 486 (1979); Steiman v. Commissioner, supra; Zolnay v. Commissioner, supra at 395; Rule 142(a), Tax Court Rules of Practice and Procedure.
*37 As to the first prong, the test is one of primary purpose, i.e., were the payments to petitioner designed to further his education or to compensate him for his services? Olick v. Commissioner, supra.In short, was he paid to work or to study?See Steiman v. Commissioner, supra at 1355. Admittedly, precise line-drawing in this area is often difficult.See Olick v. Commissioner, supra; Zolnay v. Commissioner, supra.However, from our evaluation of the entire record, we are satisfied that the primary purpose of petitioner's research activities was educational. Clearly, the overall thrust of petitioner's letter of appointment was in terms of affording him educational benefits. Although there are references in the letter to the effect that petitioner's research was to be conducted within the context of projects of the ElectroScience Laboratory, such references seem to us to be incidental to the anticipated correlation between the research and the dissertation. Moreover, from beginning to end, petitioner's research was in fact intimately and directly related to his dissertation. The 20-hours-per-week *38 requirement was submerged in the realities of the life of a doctoral candidate; petitioner worked far more than those hours without receiving additional payments. To be sure, the Army Research Office and the ElectroScience Laboratory hoped to realize some benefit from petitioner's research. However, the absence of obligations to report to anyone, the informal supervision of petitioner's research, and the substantial, if not complete, overlap of petitioner's work and his dissertation cause us to conclude that whatever benefit petitioner's work conferred on others was purely incidental and that the Army Research Office got, and hoped to get, no more than the usual by-product of scholastic excellence. Cf. Rev. Rul. 75-280, 1975-2 C.B. 47; Rev. Rul. 56-419, 1956-2 C.B. 112. That Ohio State withheld income tax from the payments to petitioner is not significant, particularly in light of the fact that he was not entitled to other employee benefits. See Steiman v. Commissioner, 56 T.C. at 1356-1357. Respondent relies heavily on Zolnay v. Commissioner, supra, to sustain his position that petitioner was not the recipient *39 of a scholarship or fellowship but rather was compensated for services rendered to the ElectroScience Laboratory. While there are some similarities between the instant case and Zolnay, we think, based upon the record in this case, that they are outweighed by several significant distinguishing factors. In our opinion, the instant case fits more into the mold of Bhalla v. Commissioner, 35 T.C. 13 (1960), where we held that payments to a graduate research assistant constituted a scholarship or fellowship and were not compensation for services. As to the second prong of the issue before us, respondent argues that the payments to petitioner were for services in excess of those required as a condition of receiving the scholarship or fellowship and of those required of other degree candidates, with the result that the limitation on the exception to section 117(b)(1) (see note 4, supra) does not apply. We disagree. On the record before us, we conclude that the research which petitioner performed was coextensive with that required of all Ph.D. candidates. To the extent that petitioner periodically summarized and reported the results of his research for Dr. Newman, *40 we think that such activity was sufficiently infrequent and minimal as not to be a determinative factor. Indeed, we think it likely that such activity was part and parcel of the efforts of all degree candidates in fulfilling the research requirements of their dissertations. In short, we hold that petitioner and all degree candidates did equivalent research and that, therefore, the limitation on the exception contained in section 117(b)(1) applies. [5]
We are reinforced in our conclusion that petitioner should prevail by the striking similarity between his position and that of the taxpayer in Rev. Rul. 75-280, supra, wherein respondent allowed an exception, under section 117(b)(1), for payments received by a Ph.D. candidate doing physics research supported by a grant from the Atomic Energy Commission. While respondent's rulings are not binding upon us (see Dixon v. United States, 381 U.S. 68, 73 (1965); Stubbs, Overbeck & Associates v. United States, 445 F.2d 1142, 1146-1147 (5th Cir. 1971)), we see no reason to depart from a ruling in a situation, such as *41 is involved herein, where respondent does not dispute the continued vitality thereof. Moreover, we are entitled to utilize Rev. Rul. 75-280, supra, as a reflection of administrative interpretation of a statute available as an aid to construction. See Hanover Bank v. Commissioner, 369 U.S. 672, 686 (1962). [6]
Respondent points to the specific caveat in Rev. Rul. 75-280, supra, excluding from its coverage any taxpayer "to the extent that the taxpayer performs services in excess of those necessary to satisfy degree requirements." 1975-2 C.B. at 48. Respondent maintains "that the petitioner was required to perform duties, as a result of his affiliation with the laboratory, which were in addition to the dissertation requirements of his degree." Our previous analysis of the extent of petitioner's activity in summarizing and reporting the results of his research *42 to Dr. Newman (see p. 10, supra), which is the factual foundation of respondent's position, disposes of his contention on this score. Decision will be entered for the petitioners. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue.↩
2. Petitioner's dissertation is entitled, "On Moment Solutions of Electromagnetic Scattering from Wire Surface Structures." The exact focus was not settled until 1979, after petitioner's research made clear that the topic would provide a viable dissertation.↩
3. SEC. 117. SCHOLARSHIPS AND FELLOWSHIP GRANTS. (a) General Rule.--In the case of an individual, gross income does not include-- (1) any amount received-- (A) as a scholarship at an educational institution * * * or (B) as a fellowship grant. ↩
4. SEC. 117(b). Limitations.-- (1) Individuals who are candidates for degrees. -- In the case of an individual who is a candidate for a degree at an educational organization * * * shall not apply to that portion of any amount received which represents payment for teaching, research, or other services in the nature of part-time employment required as a condition to receiving the scholarship or the fellowship grant. If teaching, research, or other services are required of all candidates (whether or not recipients of scholarships or fellowship grants) for a particular degree as a condition to receiving such degree, such teaching, research, or other services shall not be regarded as part-time employment within the meaning of this paragraph.↩
5. Cf. Chen v. Commissioner, T.C. Memo. 1979-407↩.
6. We also note that Revenue Rulings "may be used as precedents," 1976-2 C.B. iii, and "are published for the information and guidance of taxpayers, Internal Revenue Service officials, and others concerned." Section 601.201(a)(6), Proced,. & Admin. Regs.↩