JAMES L. AND CONSTANCE B. JOY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Joy v. Commissioner
Docket No. 9118-82.
United States Tax Court
T.C. Memo 1984-410; 1984 Tax Ct. Memo LEXIS 263; 48 T.C.M. (CCH) 762; T.C.M. (RIA) 84410; August 2, 1984. Kathryn J. Sedo and Paul Connors, for the petitioners. Jack Forsberg, for the respondent. CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: Respondent determined a deficiency in petitioners' Federal income tax of $1,156 for 1978. The issue for decision is whether amounts received by Constance Joy during 1978, which were not reported on the joint return she filed with her husband, James Joy, for that year, constitute a scholarship or fellowship within *264 the meaning of section 117. [1]
FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and the attached exhibits are incorporated herein by this reference. Petitioners Constance Joy and James Joy resided in Saudi Arabia at the time they filed their petition. During 1978, Constance Joy (petitioner) was a candidate for a Ph.D. in sociology at the University of Minnesota (University). In 1977, the National Science Foundation (NSF) provided the University with a research grant to work on the Natural Hazards Warning System Project (project). The University was responsible for selecting personnel for the project and determining their duties. The University selected petitioner in order to satisfy their staff needs. The University requested no information regarding financial need. Petitioner worked as a research assistant on the project from January 1, 1978, to September 15, 1978. She worked more than the required twenty hours per week and her work product assisted the University in the completion of the project. As a result *265 of her work, petitioner satisfied her research requirement and learned research techniques used for her dissertation. She, however, did not intend to incorporate her research data into her thesis. The research requirement was required of all degree candidates but did not require all degree candidates to perform equivalent services. Petitioner received semi-monthly payments for her services. The payments were contingent upon petitioner continuing to work on the project and working solely on project tasks. The amount of the payments was determined by whether petitioner was working half-time or full-time. The University accounted for the payments as "salary" and withheld federal and state income taxes. Petitioner received no fringe benefits. Dr. Leik, principal investigator on the project and petitioner's academic advisor, strictured petitioner's work in accordance with her academic needs. Dr. Leik acted more as an advisor than a supervisor. The Department of Sociology considers research activities a way of supporting graduate students. The University's request in 1978 to the NSF for continued funding of the project states: Graduate assistants have been increased from *266 three to a total of six at peak work periods, in order to accomodate the accelerated work pace needed in conjunction with the early start of Year Two. The added students will assist in the household portion of the project, primarily, interviewing activity, and organizing the interview schedules and data as necessary. Total work simply cannot be accomplished without the addition of these graduate assistants. Budget calculations are based on six research assistants through September 1, 1978, five assistants through December 15, 1978, and four through the balance of Year Two. These dates coincide with research loads as well as academic quarters at the University. Of course, there are educational benefits gained by the additional three students, so that there are dual advantages to the increased staff. We anticipate that most of these research assistants will be developing doctoral dissertations out of their project involvement. In addition, all will gain valuable research experience. The NSF's guidelines for preparation of proposals state that budget proposals may request funds for support of graduate students to help carry out the proposed research. OPINION Section 117(a) *267 excludes from income any amount received as a scholarship or fellowship grant. The test to determine a scholarship or fellowship grant is whether the primary purpose underlying the payment was to educate the recipient or whether it was to compensate him for services rendered. Yarlott v. Commissioner,78 T.C. 585, 595 (1982), affd. 717 F.2d 439 (8th Cir. 1983); Meehan v. Commissioner,66 T.C. 794, 803 (1976). Thus, a scholarship or fellowship is a payment with no requirement of any substantial quid pro quo from the recipient. Bingler v. Johnson,394 U.S. 741, 751 (1969). Petitioners contend that the University's primary purpose underlying the payments was to further Constance's education and training and not to compensate her for services rendered. They attempt to prove this by establishing that the payments were a form of financial assistance and that Constance derived educational benefits. In order to show that the payments were a form of financial aid, petitioners rely on the NSF's guidelines for preparation of proposals which state that budget proposals may request funds for support of guaduate students and on *268 the fact that the Department of Sociology considers research activities a means of supporting graduate students. The record, however, does not support a conclusion that a purpose of the payments was to provide petitioner with financial assistance. Specifically, the University's failure to require any information regarding petitioner's financial need refutes petitioners' contention. Petitioners next emphasize that petitioner fulfilled her research requirement and that she learned invaluable research techniques. They also note that because Dr. Leik was both a principal investigator on the project and petitioner's advisor, Dr. Leik was able to structure petitioner's work pursuant to her educational needs. The acquisition of educational benefits, however, is not controlling. Zolnay v. Commissioner,49 T.C. 389, 396 (1968). Moreover, the language of the University's request for continued funding mitigates the weight we accord petitioner's contention. While the request notes that a dual purpose would be served by the addition of graduate students, the request stresses the necessity of additional assistants in order to accomplish the total work and mentions the educational *269 benefits only as an aside. Thus, the evidence does not establish that the primary purpose of the payments was to further petitioner's education and training. The record, however, does contain ample evidence to conclude that the primary purpose of the payments was to compensate petitioner for services rendered. The payments were contingent upon petitioner continuing to work on the project and working solely on project tasks. The amount of the payments was directly proportional to the number of hours per week petitioner was required to work. Meehan,supra at 805. The additional research assistantships were intended primarily to serve the staff needs of the project. Meehan,supra at 805. Petitioner's work aided the University in the completion of the project. Zolnay v. Commissioner,supra at 397. The University accounted for the payments as "salary" and withheld taxes. Zolnay,supra at 398. Finally, petitioner did not intend to incorporate the data from her research into her thesis. Zolnay,supra at 398. Petitioners, however, argue that some indicia of an employer-employee *270 relationship did not exist. They contend that the payments were to aid petitioner in the pursuit of her studies because petitioner did not receive fringe benefits, her guidance was informal, and her work schedule was flexible. While these facts exist, the record establishes, and we hold, that the primary purpose underlying the payments was to compensate petitioner for services rendered and not to educate the recipient. Petitioners also contend that the NSF's and principal investigator's primary purpose underlying the payments was to further petitioner's education and training and not to compensate her for services rendered. These contentions are irrelevant. The focus of our inquiry is the primary purpose of the grantor in making the payment. See Fisher v. Commissioner,56 T.C. 1201, 1214 (1971). Here, the University is considered the grantor, not the NSF or principal investigator, because the University used its discretion in the selection of a recipient and determined the assistant's duties. Fisher,supra.Likewise, petitioners' contention that the primary beneficiary was Constance and not the University or NSF is irrelevant. See Brubakken v. Commissioner,67 T.C. 249, 257 (1976). *271 Petitioners next rely on Langley v. Commissioner,T.C. Memo. 1982-460, which held that the stipends the taxpayers received were excludable from gross income as scholarships or fellowships. Langley, however, is distinguishable on its facts. Unlike Langley, the payments here were not a form of financial aid. Furthermore, "strings" were attached to the payments petitioner received in that the payments were contingent upon petitioner continuing to work on the project and working solely on project tasks. Finally, petitioners contend that they meet the requirements enumerated in Rev. Rul. 75-280, 1975-2 C.B. 48. The Revenue Ruling states that: In the instant case since (1) the taxpayer was a candidate for a degree at an educational institution, (2) the taxpayer performed research, teaching, or other services for the institution that satisfied then existing specifically stated requirements for the degree, and (3) equivalent services were required of all candicates for the degree, the research services shall not be regarded as part-time employment in accordance with section 117(b)(1) of the Code. The ruling, however, is not applicable because *272 equivalent services were not required of all candidates for the degree. The research requirement could be fulfilled by any one of several diverse methods including the completion of Sociology 8-817 and 8-818 with a B average or higher and with an acceptable research paper, three quarters of a significant internship on a research project with an accompanying acceptable research paper, or any other method which is approved by the Graduate Affairs Committee. The methods are not equivalent on their face and the record contains no evidence that indicates the methods are equivalent in either quantity or quality. Thus, based on the discussion above and the record as a whole, we hold that the primary purpose of the payments was to compensate Constance. [2] Therefore, the payments are not excludable from gross income under section 117. Decision will be entered for respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, and in effect during the year in issue.↩
2. Since we conclude that the payments are not excludable as a scholarship or fellowship, we do not consider whether the limitation of section 117(b)(1) applies. See section 117(b)(1).↩